Docket 25-3019. Council, please proceed when you're ready. Good morning. May it please the courts, Kayla Gassman for the appellant Jordan Thompson. Now there are two issues in the case, the denial of a motion for new trial based on new evidence and a sentencing issue regarding the district court's reliance on Mr. Thompson's professional status. I'll address both if I have time, but I do want to focus first on the new trial issue. So here the district court erred when it denied Mr. Thompson's motion for a new trial based on new evidence that showed two key government witnesses not only lied to the jury but colluded to tell the same lie and discounting the significance and the materiality of that in the circumstances in this case and how it likely would have affected the jury when this case hinged on the credibility of those two witnesses and their biases against Mr. Thompson. Now the district court erred when it said that we had not met, that this new evidence did not meet all of the prongs of the new trial standard. So I'm going to get right into those prongs. The district court largely said that this new evidence was merely impeaching or cumulative and that's wrong. We think that's wrong. Here the district court I think really misunderstood what the new evidence showed. Let's dig into the standard of merely impeaching. So here the new evidence showed not only that the witnesses lacked a character for truthfulness, but they had actually lied to the jury and had agreed to tell the same lie. It's hard for me to see how lying to the jury under oath is merely anything. That collusion in particular, witnesses agreeing to tell the same lie, is just a different category of evidence about whether a witness is being truthful than mere impeachment, which just undermines a witness's trustworthiness. It still goes to the credibility of the witness. I mean, it's no longer mere. It's pretty damning. But it is still impeachment evidence, isn't it? Because it doesn't directly address an element. That particular impeachment evidence doesn't directly address an element of the crime, does it? I mean, it doesn't directly address an element of the crime. But I think we have to look at what the Supreme Court said in the Glossop case that we which does treat evidence that a witness is willing to lie to the jury as a distinct category of evidence than something that's merely about trustworthiness, something that's just about character for truthfulness. You can imagine an argument that, hey, this witness lied to you about this thing, but don't worry, they told you the truth about the other things is a different situation than simply trying to show motive to lie or bias. The other point I want to make about this standard is that this court's cases equate, I think, this mere impeachment standard with cumulativeness. It's merely impeaching or cumulative. And that's what the district court said here is that the new evidence was cumulative of the impeachment that had already happened at the trial. But this, again, this type of evidence that the witnesses actually agreed to tell the same lie shows lack of truthfulness in a completely different way than what was presented at the trial. What was certainly... Can I back you up to Judge Bell's point? Because I'm still struggling with that. In tracking this, the way that it would have played out is each of the witnesses would have been asked about the lab rec, lib rec thing. And presumably by your reckoning, they would have lied about that. And then you would have had to call McFall in to prove the lie, right? In other words, it does you no good until you get McFall. And that's collateral. That's collateral. And you just don't get to have a mini trial inside your trial. The general rule is if it's collateral on impeachment, you're just out of luck. And so how do you get past that? Well, how we get past that, I think, first, what I was trying to say, perhaps not effectively, is the Glossop case from the Supreme Court treats a witness's, a key witness's willingness to lie to the jury as a distinct category of evidence than evidence that's just about lack of trustworthiness. But that's got prosecutorial misconduct built into it. And we don't have that here. It did. But I don't think that's necessary for us to understand how the Supreme Court treated this type of evidence about witnesses' willingness to lie to a jury. And here we have not only that, but we have two witnesses colluding to tell the same lie in a case that hinged on the credibility of those people. And again, I want to emphasize that the district court found that this new evidence was cumulative of the impeachment that had already occurred. But this is a completely different category of evidence about whether those witnesses were telling the truth to the jury. What was done at trial, there's certainly the witness's motives and perhaps biases against Mr. Thompson was explored in depth at trial, but the jury did not hear of the fact that they had actually lied to the jury and had colluded and agreed to tell the same lie to the jury. And the district court's order did not grapple at all with the fact that this new evidence showed that the witnesses had actually lied to the jury. The district court treated it as simply like it was additional evidence about their relationship and their motives and whether they had lied to Mr. Thompson about their relationship. It ignored that they had in fact lied to the jury. The evidence, the district court also said that the evidence wasn't material because it didn't go directly to the elements of the offense. But again, Glossop tells us that that's not what materiality means, that we have to look at what a reasonable decision maker would have done with the new evidence. And here, I think that means we have to look at the impact of the new evidence in the circumstance of this case. And again, the key point here is not only that the witnesses lied to the jury, but they colluded to tell the same lie. And that was the defense theory of the case was that these witnesses were biased against Mr. Thompson and had lied about various things, including various key facts about this incident, including whether Mr. Thompson had actually pointed a gun at anyone and whether they were actually afraid that he would hurt them. So this new evidence showed not only their willingness to lie to the jury, but to collude to tell the same lie, which was precisely Mr. Thompson's theory of the case. Let me ask you at this point, does any of this matter? And could the conviction be sustained simply on the mom's Facebook commentary that her account of what happened, they went into the home, the defendant had a firearm, which he acknowledges he had in his hand at some point during this. And he said, get out or I'm going to shoot you. Why isn't that plenty good for this crime? So I think that's asking a different question. I think that's asking whether the evidence would be sufficient to support the conviction. And, you know, we haven't raised a sufficiency argument, but I think the question is asking, it's asking who cares about Ms. McFall and whether it's lab brick or lib brick, if the crime is essentially established by his own mother. And what I'm asking you really is tell me why the crime wasn't established by that testimony. Well, recall that this is an assault with aggravated assault with a deadly weapon. And there were a lot of disputes about what Mr. Thompson had done with the weapon. So no one disputed that he had it, but there was certainly an ongoing and deep dispute about whether he had used it in a way, whether he had pointed it at anyone. Are you saying pointing is an element of the crime? It's not an element of the crime, but using a deadly weapon in a manner likely to inflict injury is an element of the crime. That is part of the definition of deadly weapon. That was part of the jury instructions and part of what the jury was told they had to find to convict Mr. Thompson. So if he holds the firearm in his hand and he says, hey, Buster, get moving or else I'm going to kill you. And the guy got moving. We'll give him that. Then that's good enough or that's not good. Well, I'm not saying that would be insufficient. I think that probably would be sufficient evidence to support the conviction. But I don't think that answers the question of how this trial actually played out with these witnesses and whether their testimony that he did point the gun at them influenced the jury's verdict to convict Mr. Thompson. You understand I'm taking all of their testimony out and I'm just going with what the defendant said about coming into the house and having the firearm and having the firearm in his hands and what his mother said about the statement that he made. Get out of here. I'm going to shoot you and move everything else. Pretend that the other witnesses didn't even testify. That's enough or is it not enough? And I think you have to point. So I think it's I'm not saying that that would be insufficient. I'm saying that is a completely different trial. That is a very triable case. We certainly argued extensively throughout the trial that that Mr. Thompson had no actual intent to cause any injury. That is an element of the offense. And one of the ways I think a key way that the government tried to show that Mr. Thompson did have that intent was arguing, getting the listening, the testimony that he did point the weapon, that that is using the weapon in a way that shows he intended to cause injury, using the weapon in a way likely to cause injury, both of which are elements of the offense. Now, had had none of that testimony occurred and the only evidence was that he carried the weapon, I think that's a jury argument. That's an argument that could be made to the jury. But I think we have to look at the evidence that was put on, the arguments that were made by the parties and whether the lie, the witnesses, you know, lack of credibility, whether they lied about whether he pointed the gun actually influenced their verdict. And to me, I don't I don't see how we could say how we could remove how the case was tried, actually tried from from the inquiry that we're making about the influence of the new evidence. And again, you know, I think this this perhaps leads to the last prong of the new trial standard that we have to show that the new evidence would probably lead to acquittal. And here, you know, I think it's also relevant to look at the split verdict, because if that evidence that he carried the weapon was enough, then, you know, why did the jury acquit Mr. Thompson of the counts involving Jessica Harity? So, you know, the the jury, the evidence underlying the counts against Ms. Harity and and Mr. Lebrecht was largely the same. It was the testimony of these two witnesses. But the jury acquitted of the charges involving Harity and convicted of the charge involving Lebrecht. Now, here, the new evidence showed that those two witnesses were willing to not only lie to the jury, but to collude with each other to tell the same lie. So I think there's every reason to believe on this record that had the jury known that the witnesses were willing to collude to tell the same lie to them under oath, that they would have acquitted of the charge involving Lebrecht as well. And again, the district court also at sentencing talked quite a bit about how this was a close case. And again, the district court said, you know, the evidence was sufficient, but talked about how it was a close and difficult case. So it was a split verdict from the jury and a close case for the court. So every decision maker who was present and found this to be a close case. So we think that shows that this new evidence, if presented to the jury, would likely have led to an acquittal. If there are no further questions, I'll reserve the remainder of my time for rebuttal. Very well. Thank you. Counsel. Good morning, your honors, and may it please the court. Jared Mag on behalf of the United States. I would know I was not the underlying prosecutor in this particular matter. I do want to talk about the five factors I think that are the most relevant issue with the newly discovered evidence claim. But I want to focus on one of the factors that was not focused on here. But I do want to start and sort of echo Judge Phillips kind of what you said in terms of what what is not really challenged here are the underlying facts of the defendant walking into the house with a firearm brandished in terms of every single witness saying the same thing. And in fact, in his own Mirandized statement to law enforcement, he doesn't deny that he went into the house with the firearm and that he ordered Mr. Lebrecht to leave. And Mr. Lebrecht's testimony is quite clear that he was in fear that that, you know, a pulled firearm in his experiences is you have to assume is going to be used. And that is more than sufficient to sustain the charges here, which really gets to the to the fifth factor. But what I want to talk about is the third factor, or the second, sorry, the second factor, the lack of diligence. So I think the defendant's arguments begins to fall apart on the second factor with respect to diligence. And I want to start by sort of pointing out that the defendant in in his brief on page 31 admits that the entirety of their defense was to try to establish a relationship between Lebrecht and Haradi. And that they had colluded throughout this trial to, or at least in over the term of her relationship with the defendant, that they had acted in a way to otherwise demonstrate that they were in a relationship, torment him in some way. So it wasn't, it was not lost on anyone that that was their defense. So when you look at the fact that their primary attack against the government's case was that Lebrecht and Haradi were in fact in a real affair and not a notional one, as they had testified to, they knew how to contact McFaul. They had used the text message to cross-examine Ms. Haradi. And they could have simply had McFaul explain to them whether the text was accurate to establish that Haradi and Lebrecht had been seen together. So this isn't a situation of newly discovered evidence where they find a witness that they did not know about. They knew about McFaul. So if if your defense is that the two witnesses who you're trying to discredit are actually in an affair and colluding to tell a lie, and that that lie began at Fort Cavazos, it would seem logical that you would interview individuals that could corroborate that affair from Fort Cavazos. McFaul was known to them and McFaul could have substantiated at least at bottom that Lebrecht was somebody that Haradi had had a relationship with. We know from her statement that McFaul and Haradi had a relationship because McFaul's association with her in her redeployment term. And so McFaul isn't somebody that is new to the defense. And given what their defense was, it would seem logical that they would want to try to establish that the two individuals and the relationship was something other than what they were saying that it was. But they didn't. They chose not to ask that question. And now they're complaining that it's new evidence because they didn't do what they should have done in the first instance, which is interview McFaul to establish in fact that the text message where Miss Haradi says that she is going to socialize with McFaul with Lebrecht, that that was in fact true. And now they want to use this hindsight in an effort to try to establish that this is newly discovered evidence. But I think the third prong is something that they fail on miserably here. I do want to focus though almost exclusively now on the fact that at the end of the day that it just isn't material to the principal issue involved, the fourth factor. Again, there really is just simply no dispute about what occurred here with the defendant walking into the home, brandishing the firearm and demanding that Lebrecht leave. At the end of the day, they're really asking this court to focus in on a very nuanced, but I think unnecessary factor with respect to trying to impeach Lebrecht about whether or not he was of the defendant under the circumstances as they were known. But Lebrecht said he was, and the jury believed him. And now they're using this instance of newly discovered evidence to try to establish that this is a way to now discredit him, something that they already believed, merely on the issue of whether or not Haradi and he had somehow socialized with McFaul years earlier. And again, as Judge Phillips, as I think you appreciated, this would have established a mini trial to determine whether or not the questions that would have been asked would merely impeach them as to whether or not they socialized with them. And I think this becomes a little bit more difficult under the circumstances because we knew that Haradi and McFaul already had a relationship because that relationship existed based upon their professional association. So to try to put on a mini trial to determine whether or not socialization meant something outside of that relationship, I think would have also become somewhat of a problem. So at the end of the day, going to the materiality, you are looking at a situation of a mini trial that would get into all sorts of areas, simply on the defendant's attempt to try to discredit Lebrecht about whether or not a socialized relationship occurred between the three of them while they were at Fort Cavazos, which goes to nothing with respect to the materiality of the actual situation here. I do want to say too that I think gloss up does not apply here in the same way that the defendant would ask. There's certainly no dispute that lying under the circumstances, a witness's lie is certainly something of concern. But you have to remember what the court was looking at in gloss up in terms of the NAPU standard and the misconduct. The lie there was absolutely known and not disclosed. And so you're working under a different standard there. Here you're working under the interest of justice standard. And when you apply the five factors in the standard that has to be applied in this instance, I don't think that the same issue about whether or not the lie itself really falls into the same category as you would find in gloss up. Unless the court has any questions with respect to the first issue, I'm happy to move to the second. As to the second issue, the government of course concedes that the first prong that it was air and then the second prong that it was plain. However, I do think that it should not go unnoticed that this particular question on the use of a police officer's career as a means to establish a sentence is not sort of universal in terms of, to put it simply, you don't see it a lot. Certainly Chandler is more on point than some of the other factors. But again, I think that this case rises and falls on the third and fourth prong of the a lot of factors here. Of course, the government's position is that while the court did make statements reflecting his concern about the defendant's employment as a police officer, as a means to impose the sentence, where the defendant really tries to take this is that that determination means that the court would have otherwise entertained a sentence below the guideline range. And I think that's a hard argument to make based upon what the court had already said about its concerns with the case independent of him being a law enforcement officer. I think it's quite clear from the record that the court had concerns about the outcome of this case, but nevertheless found a reason to go ahead and stay within the guideline range. Our position is that there's nothing to suggest that the court would have otherwise entertained a sentence outside the guideline range under any circumstance. But at the end of the day, we do believe that it's the fourth prong that probably is the prong that the defendant is most likely to lose on. What we would say is an error can be prejudicial here, but not rise to the miscarriage of justice standard that the court really has to operate under. Well, I'm troubled that it would even be a concession that it was error. Sentencing judges all the time refer to the background of the people they're being they're sentencing. They came from privileged backgrounds. They came from difficult backgrounds. They had abuse as a child. You refer to all those things as part of sentencing. We're instructed that you consider the whole person, and that whole person obviously includes partly what they do. And had the court said, this guy is a police officer, and I want to send a message to all police officers that you have a higher burden to follow the law, so I'm going to really whack this guy to get that message across, that we've said would be improper. But he didn't say that. He just simply said, well, this guy has that background, and I'm taking that into account. I must say, I'm mystified why there's anything improper with what the court did. And I just don't see any connection between that statement and the prohibited reference to a socioeconomic group. I don't think of police officers as any kind of particular socioeconomic group. I think of it as a job. I mean, if you said president of IBM, maybe that would carry a socioeconomic connection. But I must say, I don't see any connection between that reference and a prohibited socioeconomic group. Yeah, Judge, we're certainly not going to discount what you believe and try to argue against that position, if that's what the court ultimately decides. I think that you're correct in saying that Judge Krause, when he made his statement, sort of leaned on the issue that he felt that the defendant should understand that position as a law enforcement officer when what comes with that is a better appreciation of the law, and that he should have known better when he did what he did. And so I can understand the court's concern, again, and I agree with the court in terms of if the defendant had used his position as an officer, much like the court appreciated in Chandler, where the defendant used his position to facilitate the offense itself. Here, the judge's concern largely was, well, because you are a police officer, you should have known better. Again, I can see and appreciate what the court's concern is there with respect to whether or not it was in fact error. But at the end of the day, the government believes that the fourth prong alone can resolve the issue even with the concession. Because when you look at whether or not it was even a miscarriage of justice, this isn't a circumstance where the guideline range or the court misjudged the guideline range itself. Nobody's questioning that the range itself was proper. And that's the situation you had in Rosales-Morales. But, you know, so there's not really a reasonable probability that a different outcome would occur in this situation. And so the defendant, at the end of the day, he has to establish something more than just the mere possibility that a lower sentence would have been entertained. And the error has to rise to the level of a miscarriage of justice if it's not corrected. And that's just not this case when you look at the types of cases where there is understandable error. And in many instances, that is where the court just simply got the guideline range wrong. And there's just no dispute about the error that had occurred under those circumstances. So this fourth prong really is reserved for the more egregious type of situations. And that just simply isn't this case. I'm happy to entertain any further questions of the court. If not, I will forfeit the remainder of my time and ask that the court affirm the lower court's decision with respect to the defendant's convictions and sentence. Would the firearm have to be pointed? I'm sorry, Judge, I didn't hear that. Did the firearm have to be pointed at one of these? No. Where the government's position is, is that the defendant's statement alone, walking in with a firearm exposed and simply telling him, you need to leave or I'm going to shoot you. The fact that the firearm was not raised is not an elemental issue in the government's position. You can see in many instances, I can imagine a number of scenarios where, you know, the defendant may be a very large individual. The gun itself may be very large. But at the end of the day, the circumstances here with him entering without knocking and demanding that he leave with a firearm exposed. And I think it should not go unappreciated, the fact that Labreck being in the military does make the statement about, you know, how that informed his own fear about why. Are you aware of any Tenth Circuit cases or even beyond the Tenth Circuit where a conviction has been upheld without the firearm? I'm sorry, without a firearm? Being pointed at the victim. Judge, I can't, I don't know any off the top of my head. If the court would ask us to rebrief the issue, we're happy to do it, but I can't think of any. You had a little time, so I thought I'd do that. Thank you. We have rebuttal time. Thank you. Let me just briefly address. So the government said a couple of times that Mr. Thompson himself admitted that he threatened Mr. Labreck. I don't recall that. I do recall him saying in his law enforcement interview that he told Labreck to leave, but I don't recall Mr. Thompson actually agreeing that he said leave or I'll shoot you. I just want that to be clear. Let me address diligence briefly. We did brief this, but again, the standard is reasonable diligence. And here, I think prior to the witnesses actually lying about what these texts meant, the text just showed that Harrity lied to her husband. There really was no need for additional evidence of talking to the McFalls about whether Harrity lied to her husband in the text. I think that was clear. The text itself referred to Labreck's wife, who at that time he was not married. And it's really not reasonable for Mr. Thompson to have to anticipate that rather than simply admitting that she lied to her husband in a text message, that in fact, she would collude with another witness to lie to the jury. So prior to the actual lie, the relevance of talking to the McFalls was just not apparent. Let me address the sentencing issue, I think just briefly with the time that I have left. We've briefed this pretty extensively, so we will rely on our briefs as well. But here, the district court was considering whether to impose the below guidelines variance that Mr. Thompson requested and put forward multiple arguments in support of. And the district court acknowledged Mr. Thompson's arguments. And then before saying he was going to impose a guideline sentence, said the reason why I'm doing what I'm doing is Mr. Thompson's as a law enforcement officer. So that clearly shows the district court's focus and express reliance on that status shows that had the court not considered that status, there's a reasonable probability the court would have imposed a sentence under the guidelines. Here, I think it's important to see that Congress has grouped socioeconomic status with things like race, sex, and religion. And I understand that it's not always intuitive that this kind of professional status is socioeconomic status. But when you take a step back, what the court was doing was relying on position alone, status alone, not having used the status, not having used the position in any way to commit the offense or conceal it, but just the fact that he's in a different category and should be punished more severely, purely because of his job. We think that was incorrect. Having run out of time, we would just ask the court to reverse both the questions. Thank you, counsel, for your helpful arguments. The case is submitted. You're excused. Thank you, Your Honor. Thank you.